THE DETROIT SAVINGS BANK v. EMILY L. TRUESDAIL, SIDNEY D. MILLER, WESLEY TRUESDAIL, MANDEVILLE POOLE AND BUCKMINSTER WIGHT.

*Foreclosure—Trusts—Purchase of claims—Marshaling assets—Rehearings—Usury.*

A trustee to whom certain mortgage securities had been assigned made a declaration of trust to a certain bank setting forth that he held them primarily to secure the indebtedness of the *cestui que trust* to the bank. *Held* that this did not of itself preclude the bank from purchasing other claims against the *cestui que trust* whether secured upon the same property or not.

A mortgage on lands given to secure notes that have been allowed to run after maturity, may be foreclosed at any time within the period of the limitation of actions for the recovery of real estate.

Where dealings between the parties to a note would be admissible as against a defendant collaterally interested with the maker, to show non-payment, *it seems* that the maker's admissions would be.

The doctrine of marshaling assets must not be applied to the mortgagee's injury; its purpose is to protect as far as possible later interests.

A junior incumbrancer joined as defendant in foreclosure and claiming the benefit of the doctrine of marshaling assets, should allege and establish such facts as would entitle him thereto.

It is the practice in Michigan on foreclosure to allow a reasonable time for payment, definitely fixed by the decree.

Where a banking institution had power to lend deposits on the public stock of the State or the United States on bond and mortgage or "upon any other securities which should be deemed by the board of directors ample," it was *held* that it was not limited to the first mentioned securities, but could discount commercial paper.

Where one banking institution is organized as successor of another whose securities are assigned to it in writing, it can enforce their payment as against parties liable thereon, even though the assignor might have rights which it did not consider of enough importance to ask the court to protect.

A rehearing for evidence which the petitioner could not produce upon the first trial is not granted if it does not appear that testimony which is not merely cumulative and could not with reasonable diligence be procured in season, has been discovered since the decision of the case, which if introduced, might in the court's opinion change the result to petitioner's advantage.

On petition for a new trial for additional evidence, the physical and pecuniary condition of the petitioner are properly considered in determining whether reasonable diligence had been shown in trying to obtain it for the first trial; so also is the knowledge of the party as to the essential facts of the case and the difficulty of establishing them by competent testimony.

Where outstanding creditors are not made parties to a foreclosure against property by which their own claims are secured, they are not concluded by the decree and have their proper remedy.

Rehearing on foreclosure will not be granted on the ground that notes secured by the mortgage were void for usury in the state where they were given.    This is so at least where the notes are apparently good.

Intention to violate the law will not be presumed.

Rehearing for new evidence will not be granted where the petitioner had an intimation that it might have been obtained and did not compel its production.

Whether notes given elsewhere to be paid in Michigan may not bear such interest as is allowed by the laws of Michigan—Q.

Parties pending suit may make any agreement with each other that does not on careful scrutiny or other evidence appear to injure the legal or equitable rights of others or contravene the law; a plaintiff may purchase his peace or agree as to the disposition he will make of the judgment he recovers.

An agreement between a complainant and defendant in foreclosure by which the former is to bid in the premises and convey them to the latter for the amount of his claim does not preclude any other person interested from paying the decree and defeating the arrangement.

An appeal by one defendant in foreclosure does not benefit another, nor does his failure to appeal prevent another from appealing.

Appeal from St. Clair. Submitted January 29. Decided April 2.

FORECLOSURE. Defendant Emily L. Truesdail appeals.

*John H. Bissell* and *Meddaugh & Driggs* for complainant. Corporations may be limited to a stated rate of interest on loans and discounts, but only to a legal rate on taking securities for and extending past obligations, *Bailey v. Murphy,* Walk. Ch., 424; banking corporations are subject to no greater penalties than individuals for violating the usury laws, *Farmers' Bank v. Burchard,* 33 Vt., 346; *Phil. Loan Co. v. Towner,* 13 Conn., 249; *U. S. Bank v. Chapin,* 9 Wend., 471; *Cameron v. Merch. etc. Bank,* 37 Mich., 240; violation of law cannot be presumed without proofs, Green's Brice's Ultra Vires, 40, 42; *Yates v. DeBogert,* 56 N. Y., 526; *Alleghany City v. McClurkan,* 14 Penn. St., 81; *Downing v. Mt. Wash. Co.,* 40 N. H., 230; *Miners' Ditch Co. v. Zellerbach,* 37 Cal., 543; no presumption of payment arises against a mortgage debt until after twenty years from its maturity, *Curtis v. Goodenow,* 24 Mich., 18; *Mich. Ins. Co. v. Brown,* 11 Mich., 265; the corporate existence of a bank cannot be questioned in a collateral proceeding in which

its right to bring action is established, Ang. & Ames Corporations, § 636; *B. & A. R. R. Co. v. Cary*, 26 N. Y., 75; *Wight v. Shelby R. R. Co.*, 16 B. Mon., 4; *Turnpike Co. v. M'Carson*, 1 Dev. & Bat., 306.

*A. R. Avery, W. T. Mitchell* and *A. E. Chadwick* for defendants.

The case as stated in complainant's bill is substantially as follows: Wesley Truesdail owed $125,000, and Suydam, Reed & Co. had accepted his paper to that amount by way of accommodation. In order to indemnify them he had executed a number of bonds to them and given them various mortgage securities, which they assigned to Howard Mather. But at Truesdail's request his creditors afterwards extended time of payment, took his individual notes, and surrendered the acceptances to Suydam, Reed & Co., and Mather conveyed all the securities to H. K. Sanger, H. H. Brown and Buckminster Wight as trustees. Truesdail then made two other mortgages to these trustees by way of farther security. One of them, dated March 2, 1857, was collateral to thirty-six promissory notes amounting to $133,225.65. Nine of these notes were held as follows: three by the St. Alban's Bank in Vermont, three by the Hartford County Bank and three by the Phœnix Bank of Hartford, both in Connecticut. These nine notes became the property of complainant, and the bill seeks to enforce their collection.

The other mortgage, dated Feb. 26, 1857, covered the "Alta Vista" farm in St. Clair county, a part of which was already subject to three mortgages as follows: one to H. P. Cady for $2,000; one to Elizabeth Stewart for $1,000; and one to Reed Jerome for $450. The bill claims that the mortgage to Cady has been assigned to Richard Cole and John L. Agens, who foreclosed it in 1859: that the land was bid in by C. I. Walker, who was solicitor for the defendant Emily L. Truesdail, Wes-

ley Truesdail's wife; that the decree was satisfied in 1874 by Mrs. Truesdail herself; and that the Cady mortgage now constitutes no lien on the property. It also claims, on information and belief, that the debt secured by the Stewart and Jerome mortgages was paid long since, but that the mortgages have been kept undischarged on record as a shield against other creditors, and it shows that the Jerome mortgage was given to pay a debt that was due more than twenty years before the bill was filed, and claims that this debt is barred.

After the execution and delivery of the mortgage on the "Alta Vista" farm, but before it was recorded, Wesley Truesdail executed and recorded two other mortgages upon the same property, as follows: one to Hiram A. Tucker, dated June 29, 1857, and one to Daniel T. Mosely, dated July 1, 1857. In 1868 these were both assigned to Sidney D. Miller. An earlier mortgage on the same property, dated December 12, 1856, but not recorded until March 12, 1857, had been given by Truesdail to Alpheus S. Williams in trust for Emily L. Truesdail, and purported to secure a note for $6,505.12 made by Truesdail to his wife. This was assigned to Sidney D. Miller in 1866. Miller was to hold the notes, bonds and mortgages assigned as security for obligations he might assume, loans he might make or procure, and services he might perform for the Truesdails or either of them. He afterwards indorsed Wesley Truesdail's negotiable paper to the amount of $6,182. This paper was held by the Detroit Savings Fund Institute, the predecessor of the complainant corporation. In December, 1870, Miller, with Truesdail's assent, made a declaration of trust to the Institute, reciting that Truesdail was indebted to it to the amount of $6,182 and that Miller held the Williams and Tucker mortgages as trustee for the payment of any indebtedness then existing or to accrue from Truesdail to it. The Institute afterwards took Truesdail's notes for $600, dated Jan. 3, 1871, and for $500, dated Feb. 14, 1871. It was succeeded July 21, 1871, by the com-

plainant bank, to which was assigned the debts secured by Miller's declaration of trust.

Complainant prayed that the Stewart and Jerome mortgages and the decree in favor of Cole and Agens be decreed to have been paid and satisfied; that the Mosely, Tucker and Williams mortgages be decreed to have been given without consideration, but to be valid liens for the amount due the bank; and that a decree be entered in its favor for the amount due on the nine notes formerly held by the Vermont and Connecticut banks; that the sum found due be declared a lien on the "Alta Vista" farm, and that this property be sold to satisfy the indebtedness of Wesley Truesdail to the bank, and of Truesdail and his wife to the defendant Miller.

MARSTON, J. Complainant filed its bill in this case to collect certain notes which it held against Wesley Truesdail, and which it was claimed were secured by mortgage upon certain lands in St. Clair county known as the "Alta Vista" farm. The principal defendant and appelant Emily L. Truesdail being dissatisfied with the decree of the court below has taken an appeal, and has here presented a number of objections to complainants obtaining the relief sought.

Wesley Truesdail being largely indebted to divers parties, upon the 2d day of March, 1857, executed a mortgage, covering certain property owned by him, but not including the Alta Vista farm, to Messrs. Sanger, Brown and Wight, trustees, and as an additional security for the same indebtedness, on the 26th day of February, 1857, a mortgage covering the Alta Vista farm was executed and delivered to these trustees. A portion of the lands described in this last mentioned mortgage were then subject to three other mortgages, one to Hamilton P. Cady for $2,000 and interest thereon; one to Elizabeth Stewart upon which there was then due about $1,000 and interest; and one to Reed Jerome for $450 and interest.

Of the notes which these mortgages to the trustees were given to secure, three were owned by the bank of Hartford county;. three by the Phœnix bank of Hartford, and three by the St. Albans bank, amounting in all to , $41,911.85. These nine notes the complainant claims to own and seeks to enforce payment thereof in this case.

This mortgage of February 26, 1857, upon the Alta Vista farm, was not recorded until August 21st of that year.

March 12th, 1857, Wesley Truesdail caused to be recorded a mortgage to Alpheus S. Williams as trustee of Emily L. Truesdail, dated December 11th, 1856, for upwards of $6,000; also, on July 14th, 1857, a mortgage to Daniel L. Mosely for over $17,000; also, June 29th, 1857, a mortgage to Hiram A. Tucker for $10,500, all covering the Alta Vista farm property.

In 1866 Wesley and Emily L. Truesdail employed Sidney D. Miller as an attorney to clear this Alta Vista farm from certain clouds claimed to then exist against it and to vest the title in himself as trustee for these parties. And to assist in carrying out this plan, certain securities were executed by Wesley Truesdail to Miller and placed in his hands, and the Mosely, Tucker and Williams mortgages were also assigned to Miller. These assignments, it is claimed, were made to Miller to secure him for obligations that he should assume for Mr. or Mrs. Truesdail or either of them; for moneys that he might loan or procure for them and for payment of any services he might perform for them; that in accordance with this agreement Miller did from time to time endorse the paper of Wesley Truesdail; that upon the 28th day of December, 1870, he was liable as such endorser to the Detroit Savings Fund Institute to the amount of $6,182; that at the date last mentioned an arrangement was entered into by which Miller was to be relieved from his liability as an endorser, and in accordance therewith Wesley Truesdail executed a new note for the amount stated, and a written declaration of

trust was executed by Miller and delivered to said Institute, reciting this indebtedness, and the assignment of the Williams and Tucker mortgages to Miller, and also the execution of certain chattel mortgages by Wesley Truesdail to Miller, and declaring that, "by direction of said Wesley Truesdail, I hold all of the property and securities above described as trustee primarily for the security and payment to said Detroit Savings Fund Institute of any and all. indebtedness now existing or hereafter to accrue from said Truesdail to said Institute." A written assent to this declaration was endorsed thereon at the time by Wesley Truesdail. The indebtedness existing from Wesley Truesdail to the Institute at that date was increased January 3, 1871, $600, and February 14th, 1871, $500. These three sums complainant seeks to collect by the foreclosure of the Williams and Tucker mortgages in this case, claiming that these and the Mosely mortgage were given without any indebtedness in fact, and that they constitute no lien upon the property, except for the amount due the complainant, and that the Cady, Stewart and Jerome mortgages have been satisfied and are no longer a lien upon the premises.

Testimony was taken on the part of complainants, but none on the part of defendants. The bill called for an answer under oath and sworn answers were put in by defendants Miller and Emily L. Truesdail.

The testimony of Messrs. Miller and Walker, with the other facts and circumstances in the case, satisfies us that Mrs. Truesdail was cognizant of the arrangements and agreements. made between Mr. Truesdail and Mr. Miller relative to the securities given the latter, and to the arrangements with, and the declaration of trust made to, the Savings Fund Institute, and that she is bound thereby. The complainant is, therefore, if the legal successor of the Savings Fund Institute,—a point noticed hereafter,—entitled to recover the amount of the notes of Dec. 28th, 1870, January 3d and February 14th,

1871, with interest, and to this extent it has an interest in and a right to foreclose the Williams and Tucker mortgages. I am not satisfied that the mortgage to Alpheus S. Williams, as trustee for Mrs. Truesdail, was given without any indebtedness in fact. Mrs. Truesdail, in her answer under oath, and which is responsive to the bill, denies that it was so given, and says it was given to secure a *bona fide* indebtedness due and owing her, and although the answer in this respect may not be as full and satisfactory as we could wish, yet I am not willing to discard it entirely, and as the record stands, come to a different conclusion.

As to the Cady, Stewart, Jerome and Mosely mortgages, I am fully satisfied they no longer can be considered a valid subsisting lien upon the land and should be declared satisfied and discharged.

While it is quite true that Mr. Miller's relations with Mr. and Mrs. Truesdail were such, either as trustee or attorney, that he could not purchase or acquire interests in or against this property adverse to Mr. and Mrs. Truesdail, yet I find nothing in the record which would in any way prevent complainant from becoming so interested. It was said that as complainant acquired its rights in the first instance through Mr. Miller, it could no more purchase or hold interests adverse to the Truesdails than he could. There is, however, nothing in the written declaration of trust tending to show the relations which Miller held with these defendants, except that he held the securities mentioned as a trustee. Beyond the fact that by this declaration certain securities were made primarily liable for the indebtedness to the Institute, there was nothing contained therein which could legally or equitably prevent the latter from purchasing any other or farther claims against these parties whether secured upon the same property or not, and the oral evidence does not tend to disclose any knowledge on the part of the officers of the Institute or any fact that would lead to a different result.

It was said that the nine notes purchased from the Connecticut and Vermont banks were barred by the statute of limitations. The mortgage given to secure these notes, if they were not paid, might be foreclosed at any time before an action for the recovery of real estate would be barred. *McKinney v. Miller*, 19 Mich., 142.

Admissions as to the non-payment of these notes made by Wesley Truesdail were proven, and it was insisted that such admissions were not admissible as against the interests of Mrs. Truesdail. In general, the negative of non-payment need not be proven. If long time has elapsed, a recognition of the debt by the debtor is generally sufficient. If the case arose under the statute of limitations it would be different, because there a new promise would be necessary, and a promise by the original debtor could not bind a party collaterally interested. But the question here is merely one of payment, and certainly the dealings between the parties showing non-payment would be admissible; why not then their statements?

It was farther insisted that as to the nine notes purchased by complainant, the security upon other property must first be exhausted before complainant can resort to the Alta Vista farm, for two reasons. *First*, that since the execution of the conveyances Mrs. Truesdail by conveyance from her husband acquired title to the equity of redemption of the Alta Vista farm, and *second*, that where one has a lien upon two separate funds, and another a subsequent lien upon one of them, the former will be compelled first to exhaust the subject of his exclusive lien, and will be permitted to resort to the other only for the deficiency.

These principles are familiar and have frequently been acted upon in this state. It should however appear that the mortgagee will not be prejudiced by the enforcement of this rule. *Cooper v. Bigly*, 13 Mich., 463. The object of the rule is not to take from the prior incumbrancer

any substantial right, but to require him to enforce his rights in such order of priority as, without loss to himself, will protect as far as practicable the subsequently acquired interests of others. *Sibley v. Baker*, 23 Mich., 312. The creditor has a right to come into court in the first instance and look to either one or both of the funds or property covered by his securities for the satisfaction of his debt. By making subsequent purchasers or incumbrancers parties, he thereby gives them an opportunity to come into court and make such a case as will show they are entitled to this protection. It is not sufficient that it appears a double security has been given, and that there is a junior incumbrance on a part of the property. It should be farther made to appear that no injury will result from an enforcement of the rule,—that the prior creditor's rights will not thereby be impaired. *Brinkerhoff v. Marvin*, 5 Johns. Ch., 320; *Post v. Mackall*, 3 Bland, 486; *Aldrich v. Cooper*, note, 2 White and Tudor's Eq. Cases, 232 et seq.

The bill in this case alleges that the property described in these other securities has been sold for taxes or on foreclosure liens, or sold and conveyed by Wesley Truesdail, and the premises are now in the possession of such purchasers or their grantees. No evidence has been introduced in support of this allegation. As against Wesley Truesdail the bill was taken as confessed, and the defendant Mrs. Truesdail in her answer neither admits nor denies this allegation of the bill, leaving the complainant to make such proof as it is advised is necessary. It was not necessary for complainant to make such proof in the first instance to entitle it to resort to the security upon the Alta Vista farm. It was for the defendant who claimed protection, to set up in her answer and establish such facts as would entitle her to the protection sought. As the case stands we are of opinion that she is in no position to insist upon the rule referred to.

In the decree it is declared and adjudged that the mortgage of February 26th, 1857, is a valid subsisting lien

upon the lands therein described for the amount due upon the nine notes, and that for the same indebtedness the mortgage of March 2d, 1857, is a valid subsisting lien upon lots 15, 16 and 17 on the south side of Pine river, and lots 1 and 2 on the north side of said river in the village of St. Clair, and orders this property to be sold, in default of payment of the amount due upon said notes, for the satisfaction thereof.   While I do not fully understand how under the bill and prayer for relief,— unless perhaps it is under the general prayer, if the facts set up in the bill would warrant it,—this property in St. Clair could be ordered sold, yet no fault is found with the decree by either party in this respect.   It may therefore be permitted to remain, and such property should therefore be first sold for the satisfaction of the amount due upon the nine notes before resorting to the Alta Vista farm.   The decree farther declares " that there is now due to said complainant the sum of $2,986.82 expended by said complainant in the care and protection of said mortgaged lands and for taxes upon the same;" declares this amount a lien upon said lands, and in default of payment orders a sale of the lands for the payment thereof.   I can find nothing in the pleadings and proofs in this case to authorize this finding or justify the court in making such an order.   The record was not printed, and some such claim may have been made, proven and overlooked.   The argument and brief of counsel refers to no claim or evidence in support of this allowance.

The decree also requires the payment of all these several amounts, aggregating over one hundred and ten thousand dollars, to be paid forthwith, and in default a sale of the premises.   The practice in this State heretofore has always been to allow a reasonable time, definitely fixed in the decree, for the payment of the money. The fact that the amount due is large, or even the improbability of its payment, would seem to afford no

sufficient reason for a departure from a correct and well established practice.

It but remains to briefly refer to some legal questions as to complainant's being the legal successor of the Savings Fund Institute, and the right of the latter to discount paper.

The Savings Fund Institute had a right to loan deposits upon the public stock of the United States or of this State, upon bond and mortgage, or upon any other securities which should be deemed by the board of directors ample. This last clause cannot, as claimed, be restricted to the same kind of security before mentioned. Under it we are of opinion the board would have power to authorize the discounting of commercial paper.

That the complainant corporation has been organized and doing business as such in apparent compliance with the statutes of this State, is not denied. The claim, among other things, is that the Savings Fund Institute could not reorganize under the act of 1871. Without attempting to present and answer the various objections urged, we deem it sufficient to say that they do not, many of them at least, properly arise in this case. There was a reorganization under the act, which if valid would operate as a transfer of these securities, and besides there was a written assignment by the Savings Fund Institute to the complainant. Under those circumstances complainant would have a clear and undoubted right to come into court and enforce payment of these securities, and it would be no defense in such a case that the Savings Fund Institute or parties interested therein might have some rights in the premises which they did not consider of sufficient importance to come into court and ask to have protected. Such questions if existing may very properly be left for settlement when raised between complainant and the parties directly interested.

I am of opinion that the decree of the court below should be modified and corrected as indicated, and as corrected affirmed; that four months should be allowed for the payment of these claims, and in default of such payment that the premises be sold; that complainant should recover costs of the court below, with costs of this court to defendant Emily L. Truesdail.

GRAVES and COOLEY, JJ., concurred; CAMPBELL, C. J., did not sit in this case.

Motion in behalf of defendant Emily L. Truesdail for a rehearing. Submitted November 19, 1878. Decided January 9, 1879.

*A. R. Avery* and *C. I. Walker* for the motion.

*J. H. Bissell* and *S. T. Douglass* against.

MARSTON, J. Upon the petition of the defendant Emily L. Truesdail, a motion has been made for and in her behalf that this case, heretofore heard and decided in this court upon pleadings and proofs, be opened so as to permit her to introduce evidence and make a defense which she was before unable to and prevented from making. The reasons assigned are that because of her physical and pecuniary inability she was unable to prepare for her defense and take testimony in the case: for newly discovered testimony; and because she was prevented from making her defense by the collusion and fraud of the complainant leading to the suppression of testimony.

There undoubtedly are many circumstances presented by the record in this case touching the physical disabilities and pecuniary embarrassments under which the petitioner has heretofore labored which strongly appeal to judicial discretion, and insure a patient and careful investigation, in order that the relief prayed for may be granted, if consistent with well settled equitable and legal principles.

In order to grant the relief prayed for, on account of the reasons assigned, it should appear from the petition and papers accompanying the same, that material testimony, not cumulative merely, which could not with reasonable and ordinary care, attention and diligence have been ascertained and procured in season, has been discovered since the submission and decision of the cause, and which, in the opinion of the court, if introduced would probably have materially changed, and to the benefit or advantage of the petitioner, the decree granted.

In ascertaining and determining whether reasonable and ordinary care, attention and diligence was exercised, the physical and pecuniary condition of the party should be considered; also the information or knowledge which she then had of the essential facts or defense, and in the light thereof, the difficulties likely to be encountered in tracing up and establishing the same by competent testimony. Fraud or collusion by others, parties to the cause, leading to the suppression of testimony is a different matter, and will be considered separately.

Owing to the importance of this cause, and for other reasons, it is deemed best to consider the evidence claimed to have been newly discovered, as well as the time of its discovery and the knowledge which petitioner possessed relating thereto at and previous to the hearing in the principal cause, and to examine the same in detail.

*I. That there are many other notes besides those mentioned in the bill of complaint, that were at the time the bill was filed and now are unpaid, and which have an equal right with those in the bill, to payment out of this property.*

The notes herein referred to, those outstanding as well as those set forth in the bill and provided for in the decree, are understood to be those secured by the Sanger, Brown and Wight trust mortgage. If these notes are, as now for the first time set forth, outstanding, unpaid, and a valid claim, the holders thereof, not having been made parties, are not concluded by the proceed-

ings already taken, and they may have their proper remedy.

This petitioner is not personally liable upon any of those notes, and she has not shown or even intimated that she, or any property in which she has a present interest, can in any way be injuriously affected thereby. If the holders of those notes had been brought in and the amount thereof incorporated and allowed in the decree, the petitioner could in no way be the gainer thereby, as the mortgaged property falls far short of satisfying the present decree.

As this case now stands, it would not seem at all necessary to make this petitioner a party to any proceedings which might be commenced by the present holders of these notes; their remedy would be against others, and in the result thereof this petitioner is not interested.

*II. That the nine notes purchased by complainant from the Vermont and other banks and included in the decree, were void for usury.*

It is proposed to establish this fact by the testimony of Wesley Truesdail, the maker of these notes and husband of petitioner.

For the purpose of properly appreciating this defense it will be best to here incorporate that portion of Wesley Truesdail's affidavit touching this subject. It is as follows:

"Affiant has the means at hand of establishing and can establish by his testimony at the time by the parties, that the nine notes held by the New England banks above mentioned, and purchased by complainant were entirely void for and on account of a portion of the consideration thereof being for usurious interest taken and received in violation of an express provision of the charter of each of said banks.

"Affiant has in his possession the original statements of account and balance sheets from which the sums were taken named in each of the notes secured or sought to be secured by the Sanger, Brown and Wight mortgage. By which statements it appears, and is the fact, that each of the said New England banks, alone herein

named, had in their account with affiant, charged him interest at the rate of seven per cent per annum, while as a fact the charter of each of said banks prohibited it from taking in any case or charging more than six per cent per annum, and the amount of the notes running to said banks was made up in part by the addition of such sum of seven per cent. to the amount owed by affiant."

Admitting all that is here set forth to be true, would it constitute a legal defense, and prevent complainants from recovering? To say the least it is going a great ways to ask a court of equity, acting in the exercise of a sound discretion, to open up a case for the purpose of permitting such a defense to be set up.

The present application is not based upon a strict claim of right to have the decree set aside and the case re-opened, but the application is made and the relief prayed for asked in furtherance of justice. Would it be in furtherance of justice to set aside the decree in this case so that the notes might be declared void and uncollectible because the bank took seven instead of six per cent interest in violation of their charter?

To permit the debtor to receive and retain the principal, and afterwards avoid payment of the whole or any part thereof, for any such reasons, would be doing a positive injustice in the name of equity, and contrary to the whole policy of the laws of this State relating to usury.

*Orr v. Lacey*, 2 Doug. (Mich.) 230, went as far we think in this direction as any case that can be found, and without saying whether we would or not follow that case in a similar one, we certainly shall not extend the doctrine there held to cases not coming in their facts clearly within it.

The notes do not upon their face show that usurious interest was taken. We cannot presume a violation of law, and it was said in the case referred to that " to constitute usury, it must be clearly established that there existed an intention to take usurious interest; for, if neither party intended a violation of law, and acted

*bona fide;* the law will not infer a corrupt agreement; and the same principle would apply to the prohibition in the charter of a bank." Nor is there anything in the affidavit tending to show, that by the charters of the banks or the laws of the state where these notes were given, the effect of taking a higher rate of interest than allowed by the charter would be a forfeiture of the entire debt. Even if such were or had been shown, I am not prepared to say that this court would feel compelled to enforce it;—certainly not by granting this motion for such a purpose. If the notes were given in New England to be paid in this state, then it might admit of some question whether the parties might not stipulate for a rate of interest allowed by the laws of this state. See case last cited, p. 254; this however we need not determine.

There is still another answer to this branch of the case, equally applicable to other evidence claimed to be newly discovered, which may here be discussed, so that a brief reference thereto hereafter will be sufficient.

The petitioner sets forth and alleges that until long since the decree was granted and affirmed on appeal, she had no knowledge whatever by hearsay or otherwise, that her husband had the original balance sheet in his possession as stated by him, and herein already referred to, or that such things were or ever had any existence. "That she had heard said Wesley say that the said notes were void for usury, and she so believed, but had no knowledge of how or in what manner she could establish the fact."

Here is a clear and positive assertion of having heard that these notes were void for usury, and that she so believed, but she asserts she had no knowledge of how or in what manner she could establish the fact.

Having heard that they were void for usury what effort did she make to establish the fact? With such knowledge, whom would a person anxious to establish such a defense, naturally call upon for proofs? Who is likely to know the facts and be able to give evidence

relating thereto? We should naturally expect the maker to have such knowledge and information, and to him a person desirous of establishing such a defense would, under all ordinary circumstances, resort. When the essential fact is known, the parties who may reasonably be supposed possessed of the facts to establish the same, should at least be called upon for information, and if when called upon they admit knowledge of the necessary facts, they should then be called as witnesses in the case.

We need not however leave this matter in any doubt or uncertainty. The petitioner in speaking of these notes says: "And said Wesley Truesdail has repeatedly asserted that said claim is absolutely invalid and worthless, and that he has proof of the same whenever he shall deem it necessary for his interest so to do." Here was not only knowledge that the notes were void for usury, but of the person who had proof of that fact whenever he deemed it for his interest to produce it. Under such circumstances it would be folly to say, that a discovery of the particular items of proof, such as a balance sheet would bring this case within the rule we have referred to. It was clearly the duty of the petitioner to have placed her husband Wesley Truesdail upon the stand, and compel him to produce his proof of the fact, whether it was for his interest so to do or not. The reason set up for not placing him upon the stand we will examine hereafter.

The next two reasons, relating as they do to the Williams and Tucker mortgages, the defendant Miller's connection therewith, and his authority to assign them to complainant, were all passed upon in the principal case and cannot be again considered.

*III. That the complainant has entered into a disgraceful, collusive, fraudulent and corrupt arrangement with the husband of petitioner, Wesley Truesdail, to procure the suppression of testimony, and to prevent her from making an efficient defense in the case.*

This plan, it is said, was concocted by officers of the complainant bank, and the motive was held out to Mr. Truesdail that he could save a large portion of the Alta Vista farm for himself, if. he would join in this plan with the bank.

It has already been determined and decreed that complainant had a valid claim for a large amount secured by this farm. They were anxious to secure payment of this claim. The Sanger, Brown and Wight trust mortgage, given to secure notes to a very large amount, it was claimed constituted a prior lien, and the amount thereof outstanding and unpaid was supposed to be within the knowledge of Wesley Truesdail. The bank had purchased for a small sum a portion of these notes, and questions had arisen in regard to the validity of certain other, mortgages upon portions of this farm, which were claimed by petitioner. Such was the condition of things in part at least, at the time the agreement between the bank and Wesley Truesdail was entered into. The agreement made is recited and set forth in the letter of March 18th, 1876, written by the Vice President of the complainant bank to Wesley Truesdail, and is in substance as follows: It recites that a stipulation had been entered into in this case pending in the circuit court by Wesley Truesdail and that he had agreed "to make a complete statement of all the money transactions between you [him] and Mrs. Truesdail, showing how much money you received from any person for her and when and from whom the same was received, and also the amount of money paid by you to her and on her account, which should be credited to you and charged to her, thus showing the true balance due her, and also what securities or property transferred to her and what was paid for the same, to the end that this bank may obtain a decree for all the sums due it in said suit. Now the bank agrees that if on the final hearing of said cause a decree shall be rendered in favor of said bank on the obligations it holds against you, and that said property referred to in the bill of complaint

38 MICH.—57.

shall be sold and the amount found due the bank shall first be paid, then the bank will proceed to enforce said decree as early as will be permitted by its terms, and will bid in said property, ordered to be sold for the amount found due said bank and decreed first to be paid. And the bank further agrees that on receiving a deed for said premises and a confirmation of the same, it will enter into a contract with you for the sale of all said property thus bid in by the bank, for the sum which shall then be found due this bank, including all advances of money made to purchase up outstanding claims against said lands and premises, as well as all other expenses, costs, fees, charges, taxes and interest incurred in prosecuting said claims, or foreclosing the mortgages, or any claim held as collateral thereto." This letter then proceeds to state how the same shall be paid by Wesley Truesdail, but the above contains and gives the material part thereof.

The writer of the above letter in another to Wesley Truesdail dated May 10th, 1875, among other things seeking an interview with Truesdail, says: "I am thoroughly convinced if you follow out the plan I suggested you can save a large portion of the property for yourself in the end, but to do this, you and I must have a perfect understanding and plan of operations laid out."

A creditor during the pendency of a suit has the privilege and right of making any agreement with one or more of the parties thereto, they may deem proper, which would not injuriously change or affect the legal or equitable rights of the others, and which would not be contrary to the laws of the land. He may purchase his peace, and he may agree as to what disposition shall be made of the judgment or property by him recovered in the case. Such agreements should however be scrutinized closely, so that they may not tend to the prejudice of the other parties defendant. Should it appear upon the face of such an agreement, or from evidence *dehors* the instrument, that the object sought to be gained

thereby, was to obtain an undue advantage, either by enhancing or enlarging their own claim or interest, or by preventing others from making their defense, to such an extent it would be fraudulent, and the parties likely to be injuriously affected thereby should be protected against any such results. Looking at the agreement as recited in the letter of March 18th, was the object thereof "to procure the suppression of testimony and to prevent the [petitioner] from making an efficient defense in the case?" We fail to discover any such object. The agreement made was not to suppress testimony, but that Wesley Truesdail should "make a complete statement * * showing the true balance due her [petitioner] * * to the end that this bank may obtain a decree for all the sums due it in said suit."

This agreement must have contemplated and intended that Wesley Truesdail should, if called upon as a witness, take the stand and make a full and truthful statement under oath concerning all matters enquired about. Such an agreement while it could in no wrongful way affect or prejudice petitioner's rights, would cut off all improper delays and defenses which otherwise might have been resorted to, and judging from the history of these transactions, as presented by the record and on the argument, the bank was justified, if such was its object, in making this agreement. Its agreement to convey the premises to Wesley Truesdail, for a certain sum, the amount of its claim, and costs and expenses, could not deprive this petitioner of any right she otherwise would have and did have to pay the decree and thus defeat this part of the agreement, and it cannot well be said that under such an agreement Wesley Truesdail would be interested in increasing the consideration he was to pay, by endeavoring to increase the claims held by the bank.

Could or did this agreement however in any way prevent petitioner from availing herself of her right to call upon her husband as a witness in the case and examine

him fully concerning all he knew in relation thereto? He did not leave the country; he was within easy reach of the court and its process during the entire pendency of the suit. As already shown, she knew he claimed to be able to prove some of these claims to be worthless, and she must have known from his relations to and concerning other of the mortgages in controversy that he could give material testimony concerning them, yet he was not called as a witness, nor was any effort whatever made to produce him.

It is said, however, that the effect of this agreement which he made with the bank was to and did prevent him from communicating with petitioner and informing her fully of all facts known to him as he otherwise would have done. Such indeed may have been the effect, and even if so, as already said, she knew sufficient, which if diligently followed up, would have enabled her to have ascertained and proven all the facts in due season. We are not satisfied that the agreement made had even this effect. It appears clearly that for a long period the social relations which we expect to find between husband and wife did not exist between Mr. and Mrs. Truesdail. If during the pendency of this suit it was his duty, as it would clearly seem to have been, to consult with his wife, advise her as to her rights in the premises and freely and fully inform her of all facts and circumstances within his knowledge which could in any way aid her in protecting her rights, so equally was it his duty during the pendency of other litigation in reference to these same matters, and yet he seems not to have done so. This agreement made with the bank was not then in the way to prevent him, yet the details he at no time communicated to her. Judging from the past, therefore, we would not be justified in assuming that the agreement referred to in the letter of March 18th was the cause of petitioner's not obtaining full knowledge of all facts known to her husband and using the same in her defense.

The agreement made between the bank and defendant

Miller, after the decree in the court below was obtained, is also complained of. If the bank entered into that agreement in order to induce Miller not to appeal from the decree, and succeeded to that extent, yet we do not well see how petitioner was thereby prejudiced; Miller's appeal if taken could not enure to her benefit, nor his failure to appeal prevent her from appealing and thus protecting her own interests. The amount obtained by the decree the bank could dispose of as it saw fit, without being called to account therefor by the petitioner, and it does not appear that Miller's course up to the time the decree was obtained, was at all influenced in anticipation or promise of such an agreement.

We have thus in view of the importance of this case, examined each of the principal reasons urged in support of this motion. We have had the benefit of a full and exhaustive argument upon the hearing,—many reasons were then urged in connection with those already discussed. We have earnestly endeavored to carefully consider and give due weight to all, so that the petitioner might have the relief she sought granted, if the same could consistently be done. Many things have been presented which entitle her to favorable consideration, but however favorably inclined we may be, we cannot consistently with duty re-open this case. It may be that had all the facts now brought forward been presented in due and proper season, they would have had some influence in framing the decree. Many of the most important facts now sought to be brought forward must be proven if at all, by the testimony of Wesley Truesdail. Some of them would be contradicted, as they have been upon this showing, by men of well known character and integrity, and upon such an issue there can be but little doubt as to what the result would be. We have not attempted to follow, with a view to explaining, the devious and winding ways pursued by Wesley Truesdail in the various transactions brought to a close in this

litigation; they have been crooked and are past finding out. His character, as an honest and upright man, one honorable, conscientious and fair in his dealings with his fellow man, willing to retain his property for the benefit of his creditors, and in so far as he could, to meet his honest obligations, is not placed in a very enviable light by this record. Indeed we need not go beyond his affidavit filed in support of this motion, to stamp him as one utterly unreliable, ready to divulge facts known to him when deemed for his own interest so to do, but with no assurance, when this had been done, that the whole truth was known. Yet it is upon his testimony, unsupported upon material points, we are asked to open this case. Much of this proposed testimony, coming from such a source, does not bear such marks of credibility as would render it at all likely to affect the conclusion already arrived at.

It follows that the motion must be denied, but without costs.

GRAVES and COOLEY, JJ. concurred; CAMPBELL, C. J., did not sit at the hearing of this motion.